In the

# United States Court of Appeals
## For the Seventh Circuit

No. 08-2283

WELLPOINT, INC., WELLPOINT HEALTH
NETWORKS INC., and UNICARE LIFE & HEALTH
INSURANCE COMPANY,

*Petitioners-Appellees*,

*v.*

JOHN HANCOCK LIFE INSURANCE COMPANY,

*Respondent-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 07 C 943—**Ruben Castillo**, *Judge.*

ARGUED FEBRUARY 11, 2009—DECIDED AUGUST 7, 2009

Before BAUER, RIPPLE, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* This case requires us to decide
how deeply into the arbitral process a court should insert
itself, once the proceeding is underway. Petitioner Well-
Point Health Networks and affiliated companies (col-
lectively, "WellPoint") prevailed in an arbitration pro-

ceeding and later petitioned the district court for confirmation of the award. The district court obliged, and now John Hancock Life Insurance Company, the losing party, has appealed. Before the district court and here, Hancock complains that the panel of arbitrators exceeded its authority by accepting the resignation of one arbitrator and subsequently filling that vacancy in a manner not specified in the arbitration agreement. This means, in Hancock's view, that the arbitration panel had no power to render a decision on the merits and its decision should be vacated pursuant to § 10(a)(4) of the Federal Arbitration Act ("FAA" or "the Act"). 9 U.S.C. § 10(a)(4). The district court was unpersuaded and held that the replacement method chosen by the panel was consistent with the general intent of the parties as expressed in their agreement. We affirm.

# I

In October 1996, WellPoint agreed to purchase various Group Business Operations of Hancock ("GBO Transaction"). The GBO Transaction was facilitated by a complicated web of contracts consisting primarily of a Purchase and Sale Agreement ("PSA"), a Coinsurance Agreement, and an Administration Agreement (collectively, the "GBO Transaction Agreements"). Each of the GBO Transaction Agreements contained an express provision mandating that any dispute be resolved through binding arbitration. Regrettably, a dispute did arise. It had to do with WellPoint's obligations under three loss-producing books of insurance business: (1) Fiduciary Administration Services

Company ("FASCO Business"); (2) James E. Hackett Reinsurance Corporation ("Hackett Business"); and (3) JEH Re Underwriting Management Bermuda Ltd. ("Bermuda Business"). Basically, the question was whether, as part of the GBO Transaction, WellPoint was obligated to make certain payments to Hancock.

WellPoint filed a demand for arbitration on October 16, 2002, asking the arbitrators (1) to compel Hancock to disclose certain information about the three contested books of business and (2) to declare WellPoint's rights and obligations under the GBO Transaction Agreements. On November 27, 2002, Hancock filed a counter-demand for arbitration, seeking $42.4 million that it claimed WellPoint owed it under the GBO Transaction Agreements. Within 20 days after service of the arbitration demand, as the agreement required, each party appointed its own arbitrator: WellPoint appointed David J. Nichols, and Hancock appointed Donald DeCarlo. The arbitration agreement then stipulated that the two appointed arbitrators should agree on a third, "Umpire" arbitrator. If they could not agree, then the arbitration agreement designated the Denver office of the American Arbitration Association ("AAA") as the party that was to appoint the Umpire. The latter option proved to be necessary when the party-arbitrators could not settle on the last member of the panel. On August 5, 2003, the AAA appointed Richard S. Bakka as the Umpire.

The arbitration was scheduled to take place in March 2006. During the two-year period leading up to the hearing, the parties conducted extensive discovery,

including the depositions of 29 witnesses and the exchange of numerous documents. Several times, the panel was called upon to resolve discovery disputes and various other procedural issues. Problems arose, however, when, in July 2005, Hancock sent WellPoint a letter stating that it was increasing its damages demand more than tenfold, from the original $42.4 million to $464.6 million. Three weeks later, presumably in response to this escalation, WellPoint obtained new counsel, replacing White & Case with LeBoeuf, Lamb, Greene & MacRae LLP. At the same time, for reasons not apparent from the record, WellPoint requested that Nichols resign as its party-arbitrator. Hancock objected to this request, but after WellPoint confirmed that it was committed to the March 2006 arbitration date, Nichols formally asked the panel to authorize his withdrawal. On September 3, 2005, the panel accepted his resignation and notified the parties of its decision by email, stating that "[t]he remanents [*sic*] of the Panel will await WellPoint's advancing of a candidate for disclosure in accord with the affirmed 'vetting.'" WellPoint proposed two separate replacement arbitrators, but Hancock objected to both of them.

In an effort to resolve the impasse, Hancock's party-arbitrator, DeCarlo, suggested that the remaining panel members propose three replacement arbitrators from which WellPoint could chose. WellPoint initially rejected this idea, while Hancock appeared to support it. Hancock's counsel even stated at one point that he "believe[d] there is case law that will support this . . . ." After further discussions, WellPoint acquiesced and, after

the panel suggested several replacement candidates, it selected Norman Krivosha, a retired Chief Justice of the Nebraska Supreme Court who also had served as an officer of a life insurance company. The panel then asked the parties to work together to vet Krivosha so that the arbitration could proceed. On October 20, 2005, the panel members, the parties, and Krivosha accordingly held a teleconference. The following day Hancock renewed its objections to Nichols's resignation but agreed that Krivosha met the prerequisites for service as WellPoint's party arbitrator. Thereafter, the Umpire sent an email to the parties stating that "Judge Krivosha is now 'gainfully employed' and the Panel is 'duly constituted.'"

With the panel in place, the arbitration proceeded as scheduled. It was conducted in two phases. Phase I occurred in March 2006 and addressed issues relating to liability and the categories of potential damages. Following the Phase I hearing, the panel issued a determination concluding that WellPoint had assumed 100 percent of the Hackett Business and 100 percent of the FASCO business, but that it had not purchased the Bermuda Business. Hancock's party-arbitrator dissented from the part of the determination that concluded that WellPoint was not liable for the Bermuda Business. Phase II of the arbitration took place in February 2007 and was limited to the quantification of damages. On April 23, 2007, the panel issued an award directing WellPoint to pay Hancock $26 million in damages. (At the request of the parties, this was revised slightly on May 21, 2007, to $26.4 million), plus $2.9 million in "offsetting balances and interest assessments." WellPoint then filed

a petition in the district court seeking confirmation of the award; Hancock in turn filed a cross-petition to vacate the panel's award, claiming, as it does before this court, that the panel was not selected in accordance with the arbitration agreement.

The district court confirmed the award. It understood the issue to be "whether the panel has authority to render an award when an arbitrator has been duly selected by a party but subsequently withdraws, and the arbitration agreement does not expressly provide for this contingency." The court concluded that the arbitration award required only that arbitration proceed before a panel comprised of one arbitrator chosen by each party and one neutral arbitrator and, because that is what occurred, the panel was properly constituted and the award should be affirmed. The court rejected WellPoint's alternative argument that Hancock waived its challenge to the composition of the panel, given its failure to contest Krishova's appointment immediately, as permitted by § 5 of the FAA.

## II

To the extent that an appeal from the district court's decision to affirm an arbitration award raises cognizable issues of law, the applicable standard of review is *de novo. Prostyakov v. Masco Corp.*, 513 F.3d 716, 723 (7th Cir. 2009). Once these predicate legal issues are resolved, however, there is very little scope for challenge, as we will not set aside an arbitral award "so long as the arbitrator interpreted the parties' agreement *at all*." *Id.* (citations omitted).

On appeal, Hancock continues to insist that the arbitration award must be vacated under 9 U.S.C. § 10(a)(4) because the panel exceeded its authority when it accepted Nichols's resignation, permitted WellPoint to choose a replacement, and appointed Krivosha. It refers to the reconstituted panel consisting of Bakka, DeCarlo, and Krivosha as the "Disputed Panel" and asserts that this panel "had no legal authority to render a binding award. . . . The Arbitration Agreement does not permit either party to remove an arbitrator or to appoint a replacement. . . . [and] the District Court . . . misconstrued the Arbitration Agreement in a way that significantly departed from the intent of the parties . . . ."

This argument invites us to consult the relevant contractual language. Section 15.3 of the arbitration agreement (which itself is in the PSA) specifies the process by which arbitrators are to be selected, as well as the requisite qualifications of the arbitrators:

> Appointment of Arbitrators. A panel of three (3) arbitrators will decide any dispute or difference between the parties. All arbitrators must be (a) disinterested officers or retired officers of life insurance or life reinsurance companies other than the parties to this Agreement or their Affiliates, or (b) disinterested persons of comparable experience. Each of the parties agrees to appoint one of the arbitrators. In the event that either party should fail to appoint its arbitrator within twenty (20) Business Days following receipt of the notice demanding arbitration set forth in Section 15.2 hereof, the party demanding such

arbitration may appoint the second arbitrator before entering upon arbitration. The two party-appointed arbitrators shall select a third arbitrator. In the event that the two party-appointed arbitrators shall not be able to agree on the choice of the third arbitrator within twenty (20) Business Days following their appointment, the parties may agree on a third arbitrator within the next twenty (20) Business Days, and if they have not then so agreed, the Denver, Colorado office of the American Arbitration Association shall, at the request of either party, appoint as such third arbitrator a person who meets the qualifications specified in the second sentence of this Section 15.3.

Hancock asserts that because the arbitration agreement does not expressly address the process for replacing a panel member, the entire arbitration process must begin anew. This, it maintains, is the general rule whenever a vacancy is created before a full and final award has been entered and the arbitration agreement has not anticipated the precise situation that arose. See *Marine Prods. Export Corp. v. M.T. Globe Galaxy*, 977 F.2d 66, 68 (2d Cir. 1992) (addressing the problem of the death of one arbitrator of a three-member panel prior to the rendering of an award). Hancock contends that because the panel failed to comply with this alleged general rule, the panel's merits award was beyond its power and must be vacated.

We find no such inflexible and wasteful rule in the law of arbitration. To the contrary, the FAA itself sets forth a rule that applies to the mid-stream loss of an arbitrator. That rule is found in § 5 of the statute, which provides as follows:

Section 5. Appointment of arbitrators or umpire

> If in the agreement provision be made for a method of naming or appointing an arbitrator or arbitrators or an umpire, such method shall be followed; but if no method be provided therein, or if a method be provided and any party thereto shall fail to avail himself of such method, or if for any other reason there shall be a lapse in the naming of an arbitrator . . . or *in filling a vacancy*, then upon the application of either party to the controversy the court shall designate and appoint an arbitrator . . . who shall act under the said agreement with the same force and effect as if he or they had been specifically named therein . . . .

9 U.S.C. § 5 (emphasis added). Section 5 anticipates the problem of a vacancy after the arbitration is underway, and it also anticipates the possibility that the parties may not have set forth a method for filling that vacancy. In such a case, either party may ask the district court to appoint a new arbitrator. The *Marine Products* court did not discuss § 5 in its brief opinion. That section would never have any room to operate, however, if every time an unanticipated vacancy occurred, the clock were automatically set back to zero.

In our view, it would be inconsistent with the purpose of the FAA, which is designed to facilitate efficient resolution of commercial disputes, to permit a party like Hancock to sit silently by while a substitute arbitrator is selected according to the procedure proposed by its own representative on the panel, and then raise an objection

to the process only after it has lost before the panel and it is attempting to oppose confirmation of the award. Hancock side-steps the incongruity of this outcome. In its view, the FAA (wisely or otherwise) provides two avenues by which a party contesting the appointment of an arbitrator may seek relief: § 5, which a party can invoke immediately after the contested arbitrator appointment, or § 10(a)(4), which a party can invoke following the conclusion of the arbitration on the merits. The latter section authorizes the court to vacate an arbitral award "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4).

What Hancock fails to appreciate, however, is that this approach does not give full effect to each part of the statute. If the statute were read to permit an objecting party to take a "wait and see" approach, no one would ever have an incentive to use § 5. Instead, each party could hold back and await the outcome of the proceeding. If that outcome were to its liking, then it would defend the substitution; if that outcome were not to its liking, then it could attack the method either the court or the parties used to nominate the new arbitrator. Moreover, if there really were a general rule that substitutions are forbidden once the arbitration is underway (as long as the agreement is silent), then there would never be a case in which a court could fill a vacancy upon the application of a party. We decline to read the FAA in a way that effectively deletes this part of § 5, nor will we interpret it as creating a "heads I win, tails you lose" system.

This is not to say that in all cases a party who fails to challenge an arbitrator appointment at the § 5 stage forfeits that challenge for § 10 purposes. There may be some situations where a motion under § 5 cannot address the problem; in addition, there may be times when a party can show good cause to overcome a forfeiture of the § 5 process and can raise its objections at the § 10(a)(4) stage. We leave for another day, however, any further speculation about what might justify bypassing § 5, given the fact that this case is so far from any plausible scenario. Hancock's equivocal behavior—starting with the fact that the substitution procedure actually used was proposed by DeCarlo, its own party-arbitrator, continuing with its legal argument supporting DeCarlo's suggestion, and ending with its acknowledgment that Krivosha met the qualifications required in the agreement—coupled with its decision to wait until the arbitration was concluded, was a "transparent attempt to preserve a threshold procedural issue in case . . . [it] eventually lost the arbitration on the merits." *Dow Corning Corp. v. Safety National Cas. Corp.*, 335 F.3d 742, 748-49 (8th Cir. 2003). Nothing in the FAA requires us to endorse this behavior.

Taking another tack, Hancock also argues that a requirement that a party bring a challenge to an arbitrator appointment at the interlocutory stage conflicts with this court's decision in *Tamari v. Conrad*, 552 F.2d 778 (7th Cir. 1977), and encourages parties to bring interlocutory appeals during arbitration proceedings. It thus suggests that use of § 5 would be even less efficient than the tactic it has chosen. Neither of these arguments is persuasive.

The decision in *Tamari* related not to forfeiture under § 5 of the FAA, but to arbitral immunity in cases where the authority of an arbitrator to resolve a dispute is challenged. *Id.* at 780. *Tamari* has nothing to do with § 5 and thus has no bearing on the question before us.

Similarly misplaced is Hancock's assertion that an interpretation of the FAA that requires parties to contest arbitrator appointment at the time of that appointment undermines efficiency. Hancock raises the specter of endless interlocutory appeals, which would delay the arbitration and excessively involve the judiciary in the process. What Hancock fails to acknowledge, however, is that § 5 is limited to arbitral appointments. And while an interlocutory motion to challenge an appointment does temporarily affect the arbitration, it is far less efficient for the court to hold at the § 10 stage that the appointment was improper. In fact, if anything risks too much judicial involvement, it is Hancock's proposed system, under which judges would second-guess the arbitral panel's own approach toward solving an interim procedural issue.

Section 5 of the FAA expressly gave the district court the authority to resolve any issue about the way the parties handled a vacancy on the arbitral panel. Hancock's failure to use that tool, under the circumstances of this case, resulted in its forfeiture of this challenge. No "reservation of right" to challenge the issue on appeal absolves Hancock from this requirement. We add, for the sake of completeness, that Hancock's own participation in the substitution process should estop it from complaining

now about it, and so even if we thought that § 5 could be bypassed (which we do not), this would not be an appropriate case for relief.

Because no other issues raised in this appeal warrant further discussion, we AFFIRM the judgment of the district court.